## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

THRIFTY RENT-A-CAR SYSTEMS, INC., )
an Oklahoma corporation, DTG OPERATIONS,)
INC., an Oklahoma corporation and )
RENTAL CAR FINANCE CORP., )
an Oklahoma corporation, )
)
   Plaintiffs, )
)
v. )  **Case No. 04-CV-0751-CVE-SAJ**
)
SOUTH FLORIDA TRANSPORT, INC., )
a Florida corporation, DANNY L. HARDY, )
an individual and ALAN I. GREENSTEIN, )
an individual, )
)
   Defendants. )

## OPINION AND ORDER

   Now before the Court is plaintiffs' Motion for Summary Judgment and Brief in Support

(Dkt. # 43).  Plaintiffs, Thrifty Rent-A-Car System, Inc. ("Thrifty") and its affiliates, DTG

Operations, Inc. ("DTG") and Rental Car Finance Corp. ("RCFC"), move for summary judgment

against Alan I. Greenstein ("Greenstein") for breach of guaranty agreements entered into by the

parties.[1]

## I.

   The undisputed facts are as follows:  Thrifty, as part of its business operations, permits the

operation of franchises by "licensees", who, for a fee, acquire the right to utilize the Thrifty brand

and operate a Thrifty rental car establishment.  DTG, in turn, leases vehicles to Thrifty licensees for

---

[1] This Court received notices of bankruptcy from defendants South Florida Transport, Inc. and
Danny L. Hardy on October 19, 2004 and October 24, 2005, respectively. This case is
automatically stayed as to those defendants.

use at authorized locations. RCFC leases the vehicles it owns to DTG.  DTG and RCFC hold legal title to the vehicles leased to Thrifty licensees.

In September and October 2003, South Florida Transport, Inc. ("SFT"), a business dedicated to car rental, leasing, and parking, entered into four Licensing Agreements ("the Licensing Agreements") with Thrifty.  Paragraph 2.1 of each agreement empowers SFT "to utilize the Thrifty Marks, the Thrifty Business Method and the Thrifty Car Rental Method as the same are in force from time to time in connection with the operation of a Thrifty Business . . . " within "licensed territory," as designated within each agreement.  Plaintiffs' Motion for Summary Judgment and Brief in Support (hereinafter "Motion for Summary Judgment") (Dkt. # 43), Exs. A, E-G, Licensing Agreements, ¶ 2.1.[2]   In consideration for the license, SFT agrees to pay Thrifty a licensing fee, certain administrative fees, and a fee associated with the use of Thrifty's reservation system.

The Licensing Agreements require that SFT maintain a fleet of automobiles for use in the operation of SFT's rental car business.  Accordingly, SFT entered into a Master Lease Agreement ("MLA") with DTG in September 2003.  That MLA governs the use by SFT of cars leased from DTG and states, inter alia, that SFT will be responsible for payment of a leasing fee to DTG for the use of the cars and makes clear that DTG retains legal title to the vehicles during the lease term. Motion for Summary Judgment (Dkt. # 43), Ex. B., Master Lease Agreement, at ¶ 8-A.

Appended to each agreement is a guaranty agreement signed by then-president and vice president of SFT, Danny L. Hardy ("Hardy") and Alan I. Greenstein ("Greenstein"), unconditionally

---

[2]     At the inception of the agreements, the "licensed territory" encompassed by the four Licensing Agreements included: Mobile, Alabama and the following Florida cities: Fort Pierce, Vero Beach, Stuart, Sarasota, Bradenton, Panama City, and Tallahassee.  Motion for Summary Judgment (Dkt. # 43), Exs. A, E-G.

guaranteeing the performance of all of SFT's obligations under the terms of the Licensing Agreements and the MLA.  Those guaranty agreements, and Greenstein's alleged breach of those agreements, constitute the basis of plaintiffs' claims against Greenstein.

It is undisputed that in July 2004, DTG received notice that a check for $331,000 submitted to DTG by SFT was returned for insufficient funds.  SFT eventually replaced the value of the check, but SFT continued to be delinquent in its obligations to both DTG and Thrifty.   Representatives from Thrifty and DTG made repeated, unsuccessful  attempts to obtain the past due funds. Greenstein provides no evidence to dispute plaintiffs' claim that by August 2004, SFT owed Thrifty approximately $287,664.57 under the Licensing Agreements and owed DTG, Thrifty's affiliate, approximately $847,154.83 under the MLA, for a total of $1,134,819.40.

Upon SFT's failure to transmit the amounts owed to DTG, DTG notified SFT, in a letter dated September 9, 2004, that it had terminated the MLA between SFT and DTG, due to SFT's delinquency.  The letter states that a DTG representative would take possession of the leased vehicles, as permitted by the MLA, and instructed SFT to ground all vehicles in preparation for the transfer of possession to DTG.  In a subsequent letter, bearing the same date,  DTG agreed to delay repossession of the vehicles due to predictions of severe weather.  In that letter, DTG granted SFT permission continue to rent DTG vehicles under the terms of the MLA until September 16, 2004, the day on which DTG representatives would take possession of the leased vehicles from SFT. In a letter dated September 29, 2004, Thrifty similarly notified SFT that Thrifty would terminate its four existing Licensing Agreements on October 18, 2004, if SFT failed to correct certain alleged breaches of the Licensing Agreements, including, inter alia, failing to report and pay various administrative and advertising fees.

Representatives of DTG arrived at SFT facilities on September 16, 2004 to repossess the approximately 1200 vehicles leased to SFT by DTG under the MLA.  In the process of repossession, DTG employees observed that certain vehicles were missing.  The evidence is uncontested[3] that, when questioned, Hardy informed the DTG employees that SFT had sold approximately fifty eight of the vehicles out-of-trust to third parties.  According to Hardy, SFT sold the cars in order to obtain money to pay the outstanding debts due to DTG and Thrifty.  SFT neither informed DTG or its affiliates of these sales, nor paid DTG any of the proceeds.  Nevertheless, copies of unsigned checks, dated September 13, 2004, purporting to reimburse Thrifty for the sale of the cars, constitute part of the summary judgment record.  Plaintiffs claim they never received signed checks, and Greenstein does not now claim that any of the defendants actually sent DTG the checks.  As a result of these unauthorized sales, SFT received approximately $1,108,355.96.

On October 18, 2004, SFT filed a voluntary petition in bankruptcy.  According to the rules governing SFT's bankruptcy, termination of the Licensing Agreements did not immediately take effect, and SFT was permitted to continue to operate as a Thrifty licensee during the course of those proceedings.  SFT's original Chapter 11 proceeding was converted into a Chapter 7 liquidation proceeding in May 2005.  Although Thrifty filed a notice of claim in that bankruptcy, plaintiffs have not received any payments from SFT's bankruptcy estate.

As of August 4, 2005, SFT was indebted to Thrifty and DTG in the amount of $4,238,249.53[4] as a result of its default on its obligations under the terms of both the Licensing

---

[3]     Indeed, appended to plaintiffs' motion for summary judgment are copies of the "deal recaps" documenting those sales.  Motion for Summary Judgment (Dkt. # 43), Ex. L.

[4]     This amount includes the money DTG would have charged SFT for the purchase of the vehicles sold in trust by SFT to third parties.

Agreements and the MLA.  Since SFT has since sought bankruptcy protection, the guaranty agreements signed by Greenstein would appear to make him responsible for SFT's outstanding financial obligations.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994)

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Greenstein makes no attempt to deny the existence of the applicable guaranty agreements or their validity.  Defendant argues instead that  SFT's failure to pay its financial obligations to Thrifty and DTG is excused under various contract doctrines.  SFT's release from its duties, he further submits, releases him from his obligations under the guaranty agreements.[5]

Since a proper determination of Greenstein's liability under the guaranty provisions requires that the court consider whether the facts in the summary judgment record raise a genuine issue of material fact as to the availability to SFT of multiple affirmative defenses, the Court necessarily addresses those issues.

## A.

Greenstein claims that the occurrence of a series of hurricanes in August and September 2004 made performance by SFT of its obligations under the Licensing Agreements and MLA impossible and that SFT's failure to perform is, therefore, excused.

_____

[5]     Defendant raised these defenses in his answer to plaintiff's complaint, filed jointly with Hardy. Curiously, Greenstein's response to plaintiffs' motion for summary judgment makes no mention of these claims.  Instead, Greenstein's response accuses Thrifty of effectively destroying the business of SFT by refusing to permit SFT to purchase additional markets or to accommodate SFT's financial hardship.

Impossibility of performance may serve as a justification or excuse for nonperformance of a contractual obligation. The original, "harsh common law rule" of impossibility, <u>Kansas, Oklahoma & Gulf Ry. Co.v. Grand Lake Grain Co.</u>, 434 P.2d 153, 157 (Okla. 1967), which typically denied relief to those found in breach due to supervening circumstances, has yielded to the modern manifestation of the doctrine, which reflects a more forgiving "impracticability" standard, as embodied in the Restatement (Second) of Contracts, § 261.[6]   Under the current rule, "After a contract is made, if a party's performance is made impracticable by the occurrence of an event, the nonoccurence of which was a basic assumption upon which the contract was made the party is relieved of the obligation."   <u>Central Kansas Credit Union v. Mutual Guar. Corp.</u>, 102 F.3d 1097, 1102 (10th Cir. 1996) (citing Restatement (Second) of Contracts, § 261.).   This pronouncement has been distilled into a three-prong test, requiring that in order to succeed on a claim of impracticability, a defendant must demonstrate (1) the unexpected occurrence of an intervening act; (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties; and (3) that occurrence made performance impracticable.   <u>Opera Co. of Boston</u>, 817 F.2d at 1102.

---

[6]   <u>See</u>, <u>e.g.</u>, <u>Opera Co. of Boston, Inc. v. Wolf Trap Found. for the Performing Arts</u>, 817 F.2d 1094, 1099(4th Cir. 1987) ("[M]odern authorities also abandoned any absolute definition of impossibility and, following the example of the Uniform Commercial Code, have adopted impracticability or commercial impracticability as synonymous with impossibility in the application of the doctrine of impossibility of performance as an excuse for breach of contract."); <u>Burlington Northern & Santa Fe Ry. Co. v. Kansas City Southern Ry. Co.</u>, 45 F. Supp. 2d 847, (D. Kan. 1999) ("There is . . . no legal distinction between 'impracticability of performance' and 'impossibility of performance . . . . The common law doctrine of impracticability is an outgrowth of the doctrine of legal impossibility.  Over time, the terms have become somewhat interchangeable.") (internal citations and quotation marks omitted).

Performance may become impracticable due to extreme and unreasonable difficulty, expense, injury, or loss to one of the parties involved. Restatement (Second) of Contracts, § 261(d). Impracticability does not equate to impracticality, however. "A mere change in the degree or of difficulty or expense . . . unless well beyond the normal range does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover." Id. The law also imposes an objective standard on the duty to perform for those seeking to invoke the defense of impracticability. A party to a contract is not discharged from his duty to perform merely by demonstrating that a supervening event prevented him from performing; he must also demonstrate that similarly situated parties were also deprived of the ability to perform. Oklahoma Gas & Elec. Co. v. Pinkerton's Inc., 742 P.2d 546, 548 (Okla. 1986).

The undisputed facts relevant to Greenstein's claim of impracticability are as follows: In August and September 2004, Hurricanes Charley, Frances, Ivan, and Jeanne[7] hit the state of Florida. One of those storms, Hurricane Ivan, also affected the state of Alabama. Although some of SFT's rental car business locations incurred damage during the course of the storm, it is undisputed that the locations remained substantially intact, and the vehicles leased from DTG were not destroyed. Motion for Summary Judgment (Dkt. # 43), Ex. D, Deposition of Danny L. Hardy, at 98. Collectively, SFT's rental car locations suffered a total of fifty five days of lost business due to the effects of the storms.

The hurricanes in late summer 2004 clearly constitute supervening events for the purposes of impracticability doctrine. However, the record suggests that the non-occurrence of those

---

[7]     Although plaintiffs' motion for summary judgment calls the fourth hurricane "Jeannie," the exhibits attached to its motion, including a report from the National Hurricane Center, refer to the storm as "Jeanne."

hurricanes was not an asssumption upon which the parties grounded their agreement.  Hardy testified that he lived in Florida approximately ten years, during which time severe weather, including hurricanes, had hit the coast of Florida.  Motion for Summary Judgment (Dkt. # 43), Ex. D, Deposition of Danny L. Hardy, at 104.  Greenstein also testified to living in Florida during several hurricanes.  Motion for Summary Judgment (Dkt. # 43), Ex. R, Deposition of Alan I. Greenstein, at 78.  Greenstein's further testimony belies any argument that the parties' agreement contained an implied term assuming the non-occurrence of hurricanes:

> Q: So in light of that, isn't it true that everyone who does business in Florida assumes a risk that that business could be adversely affected by hurricanes?
> A: It's true that anybody that does any kind of business anywhere can be affected by anything at the time like 911.
> Q: But a business that does business in Florida, it would be more likely to be impacted by a hurricane than a business that is in business in Nebraska, would you agree with that?
> A: Of course, of course. It's just like when you're in California you're going to get hit by earthquakes.
> Q: And that's just one of the things that you have to kind of take into account when you open a business in Florida that we could have a hurricane come through here.
> A: I lived here all my life, I won't move, so that's just a part of the roam of my environment.
> Q: You live and operate with the fact that some day you could have a hurricane hit that might–
> A: It's very possible. . . .

Motion for Summary Judgment (Dkt. # 43), Ex. R, Deposition of Alan I. Greenstein, at 80-81.  This testimony, plus the widely-publicized frequency of such storms affecting the state, leads the Court to conclude that it is hardly conceivable that hurricanes were not an eventuality "which the parties could reasonably be thought to have foreseen as a *real possibility* which could affect performance . . . ." Opera Co. of Boston, 817 F.2d at 1101 (emphasis in original).

Even if the Court were to assume that the parties contracted assuming that hurricanes would not occur, the undisputed evidence in the record makes clear that the hurricanes did not make

performance impracticable as a matter of law.   According to the testimony of Hardy, business

continued after the hurricane's landfall:

> Q: But business did eventually come back?
> A: Eventually.
> Q: And what about aid workers, the Red Cross, people like that.  Did they come in
> immediately after the hurricane hit and rent cars?
> A: Some.
> Q: So you did have some business actually?
> A: Some.

Motion for Summary Judgment (Dkt. # 43), Ex. D., Deposition of Danny L. Hardy, at 98.  Finally,

and perhaps more importantly, the record is clear that SFT became delinquent in its payments to

plaintiffs prior to the arrival of any of the hurricanes of 2004.  Indeed, an affidavit submitted on

behalf of Thrifty states that Thrifty and DTG had notified SFT of its failure to meet its obligations

as early as May and June 2004, two months before the arrival of the hurricanes.  Motion for

Summary Judgment (Dkt. # 43), Ex. C, Affidavit of Kirk Browning, at ¶ 5.  This uncontested fact

seriously undermines any claim that the hurricanes were the cause of SFT's failure to perform.  In

fact, it suggests that the hurricanes may have had nothing to do with SFT's ongoing delinquency.

Accordingly, the Court finds that no genuine issue of material fact exists as to the availability of the

affirmative defense of impracticability of performance to excuse SFT's default.

**B.**

Defendant argues that the event of the hurricanes made SFT's performance under the

contract commercially impracticable and seeks to excuse SFT's failure to perform under the rule of

commercial impracticability.

The doctrine of commercial impracticability is typically invoked in cases involving the sale of goods.[8]  Codified in section 2-615 of the Uniform Commercial Code (UCC), which has been adopted by the Oklahoma legislature,[9] the doctrine of commercial impracticability provides a defense to a seller for a delay in delivery or nondelivery of promised goods if performance has been made impracticable by a contingency, the non-occurrence of which is an assumption of the contract. Okla. Stat. tit. 12A, §2-615.

Commercial impracticability may excuse a party from performance of his obligations under a contract where performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting. Okla. Stat. tit. 12, § 2-615 cmt. a.  UCC commentary provides that a party pleading commercial impracticability must demonstrate the "basic assumption" prong of the test also found in the impracticability of performance context, that is, that the non-occurrence of the supervening event was a basic assumption of the parties at the time of contracting.  Id. cmt. 3; see also Bernina Distribut., Inc. v. Bernina Sewing Machine Co, Inc., 646 F.2d 434, 439 (10th Cir. 1981) ("[T]he exemptions of [section 2-615] do not apply when the contingency in question is sufficiently

---

[8]     One contracts treatise observes:

By its terms, the commercial impracticability doctrine embodied in UCC § 2-615 may be invoked only in a transaction for the sale of goods. . .  Nevertheless, courts have applied by analogy the commercial impracticability language of [section] 2-615 to commercial situations beyond the UCC's scope.  Consequently, a party may be inclined to argue commercial impracticability whether or not the UCC is explicitly applicable.

Corbin on Contracts § 74.8.

[9]     The Licensing Agreements and the MLA each provide that Oklahoma law governs the interpretation and execution of the agreements.

foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable commercial interpretation from the circumstances.").  A rise or a collapse in the market standing alone does not constitute a justification for failure to perform.  Id. at cmt. 4.  A contract is deemed commercially impracticable when due to unforeseen events, performance may only obtained at "an excessive and unreasonable cost . . . or when all means of performance are commercially senseless."  Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed. Cir. 2002).  In applying the doctrine of commercial impracticability, the crucial question is "whether the cost of performance has in fact become so excessive and unreasonable that failure to excuse performance would result in grave injustice."  Freidco of Wilmington, Delaware, Ltd. v. Farmers Bank, 529 F. Supp. 822, 825 (D. Del. 1981).

For many of the reasons already discussed, defendant is not entitled to the defense of commercial impracticability.  The evidence strongly suggests that the non-occurrence of hurricanes was not a basic assumption of the parties' agreements.  Moreover, defendant provides no evidence to support a suggestion that the event of the hurricanes made the cost of performance of the terms of the agreements unduly burdensome, or even remotely more expensive.  Finally, the Court observes, again, that SFT was behind on its payments to Thrifty and DTG before the arrival of the hurricanes in August 2004.  No genuine issue of material fact exists, and the Court holds that the defense of commercial impracticability is unavailable to defendant.

## C.

Defendant contends that the hurricanes of 2004 frustrated SFT's intended purpose in entering into the Licensing Agreements and MLA and that, as a result, SFT is relieved of its duty to perform.

The defense of frustration of purpose is defined as follows:

> Where after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Sabine Corp. v. ONG Western, Inc., 725 F. Supp. 1157, 1178 (W.D. Okla. 1989) (quoting Restatement (Second) of Contracts, § 265).  To avail itself of the defense, a party must establish three elements: (1) frustration of the principal purpose of the contract; (2) that the frustration is substantial; and (3) that the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made.  Id.  Under the doctrine of frustration of purpose, performance is not impossible, but is excused because "a fortuitous event supervenes to cause a failure of the consideration or a total destruction of the expected value of the performance of the contract."  Kansas City Power & Light Co. v. Pittsburgh & Midway Coal Mining Co., Civ. A. No. 88-2224 S., 1989 WL 151919, at *6 (D. Kan. Nov. 17, 1989).

Application of the doctrine of frustration of purpose requires, first, identification of the "principal purpose" of a given agreement.  The Licensing Agreements and MLA do not include a statement of purpose.  Nevertheless, the purposes of the agreements are readily ascertainable from their terms.  In signing the Licensing Agreements, defendant SFT contracted for the use of the Thrifty name and business method in its rental car business.  SFT made its agreement with DTG in furtherance of its plan to operate Thrifty rental car locations.  The uncontested facts reveal these purposes suffered no impairment as a result of the hurricanes.  The cars remained intact and

available for rental and, indeed, SFT conducted some business immediately following the occurrence of the hurricanes.[10]

Accordingly, the Court finds that the principal purpose of the contracts at issue was not undermined by the occurrence of the hurricanes.  Having so found, that Court need not consider the final two elements of the defense.  Since defendant has not raised a genuine issue of material fact as to frustration of the principal purpose of the contracts at issue, summary judgment as to that defense is appropriate.

**D.**

Defendant alleges that plaintiffs have failed to state a claim against defendants.  The basis for this defense is unclear, and the Court goes no further than to observe that plaintiffs' claim for breach of contact due to defendant's failure to perform under the terms of the guaranty agreements does state a claim.

**E.**

Defendant states that the action against him is "premature in that there has been no legal determination that the corporate [d]efendant owes any monies to [p]laintiffs[11]. . . . [W]ithout such a legal determination, no individual liability can be imposed upon the [d]efendant under the terms

---

[10]     As plaintiffs correctly point out, the frustration of a hoped-for profit alone does not constitute valid grounds to excuse performance.  See Seaboard Lumber Co. v. United States, 308 F.3d 1283 (Fed. Cir. 2002) (noting that defendant could not excuse performance under frustration of purpose doctrine by arguing that its profit motive was frustrated by a slump in the market); Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co., 931 F.2d 1112, 1120 (6th Cir. 1991) (affirming the district court's determination that a dramatic downturn in the farm equipment market resulting in reduced profitability did not frustrate the primary purpose of the agreement at issue).

[11]     The Court notes that, to the contrary, this Opinion and Order is in fact a legal determination of the status of the underlying debt owed by SFT to plaintiffs.

of the guaranty." Motion for Summary Judgment (Dkt. # 43), Ex. O, Responses and Objections of

Defendant Alan I. Greenstein to Plaintiff's Second Interrogatories and Requests for Production of

Documents (hereinafter "Defendant's Responses to Interrogatories"), at 4.

"The obligation of a guaranty is contractual, and the inquiry must, in each case, focus on the

precise terms of the guarantor's undertaking the dimension or breadth of the promise." Riverside

Nat'l Bank v. Manolakis, 613 P.2d 438, 441 (Okla. 1980)  Neither the Licensing Agreements nor

the MLA includes a provision barring the enforcement of the guaranty agreements absent a legal

determination of the status of the debt owed by SFT.   Under the personal guaranty agreement

appended to the Licensing Agreements and signed by Greenstein, defendants' liability is

unconditional and is "effective despite any extension, renewal, modification or waiver by THRIFTY

and/or its Affiliates of any of LICENSEE'S obligations hereunder, and no such extension,

modification, renewal or waiver shall operate to defeat this guarantee."  Motion for Summary

Judgment (Dkt. # 43), Exs. A, E-G, Thrifty Licensing Agreements-Personal Guarantees of Danny

L. Hardy and Alan I. Greenstein.  The MLA guaranty agreement, similarly, includes a particularly

broad allocation of liability.  It reads:

> In order to hold the undersigned liable hereunder for the Indebtedness as provided
> herein, there shall be no obligation on the part of the Company, at any time, to resort
> for payment to Debtor or any other guarantor or to any security for the Indebtedness
> or this guaranty, and the Company shall have the right to enforce this guaranty
> irrespective of whether or not other proceedings or steps are being taken against
> property securing the Indebtedness or against any other guarantor or any other party
> primarily or secondarily liable on any of the Indebtedness.

Motion for Summary Judgment (Dkt. # 43), Ex. B., Master Lease Agreement-Guaranties of Danny

L. Hardy and Alan I. Greenstein.  The terms of the guaranty agreements make clear that plaintiffs'

ability to enforce the promises of the guaranty is not impacted by the lack of a judgment against SFT.

The Court concludes, therefore, that no genuine issue of material fact exists as to plaintiffs' alleged failure to fulfill conditions precedent to the enforcement of the guaranty agreements contained in the Licensing Agreements and the MLA.

## F.

Defendant alleges that plaintiffs breached their duties to defendants.  Specifically, he alleges the following: (1) plaintiffs may not recover because of their prior material breaches of the agreements with defendants; (2) defendants are entitled to a set-off of the amounts owed under the agreements due to plaintiffs' wrongful conduct and prior material breaches of the agreements; (3) plaintiffs are estopped from asserting their claims against defendants because of plaintiffs' wrongful conduct and/or "unclean hands;" (4) plaintiffs' claims have been waived, released, or discharged or plaintiffs have otherwise allowed and ratified non-payment of the amounts sought from defendants; and (5) plaintiffs' injury was suffered as a result of plaintiffs' wrongful action and inaction. Asked to explain the basis for these claims, defendant states, "Plaintiffs breached the covenant of good faith and fair dealing by terminating SFT's franchise rights notwithstanding" the occurrence of the hurricane. Motion for Summary Judgment (Dkt. # 43), Ex. O, Defendant's Responses to Interrogatories, at 4-5.

Under both Oklahoma common law and the Uniform Commercial Code, every contract includes "an implicit and mutual covenant to act towards each other in good faith."  Beshara v. Southern Nat'l Bank, 928 P.2d 280, 287 (Okla. 1996).  A failure to perform in good faith a particular duty or obligation under the contract constitutes a breach or makes unavailable a remedial

16

right or power.  Okla. Stat. tit. 12A, § 1-203, UCC cmt.  "The common law imposes this implied covenant upon all contracting parties, that neither party, because of the purposes of the contract, will act to injure the parties' reasonable expectations nor impair the rights or interests of the other to receive the benefits flowing from their contractual relationship."  First Nat'l Bank & Trust Co. of Vinita v. Kissee, 859 P.2d 502, 508 (Okla. 1993).  Absent gross recklessness or wanton negligence, a breach of the implied covenant of good faith and fair dealing merely constitutes a breach of contract; it does not create an independent basis for suit.  Id.

Not only has defendant failed to demonstrate bad faith on the part of plaintiffs, but also there is no evidence in the record that plaintiffs breached either the Licensing Agreements or the MLA with SFT or that plaintiffs owed any duties to Greenstein individually under the agreements. Plaintiffs' motion for summary judgment is granted as to these defenses.

**G.**

Greenstein claims that plaintiffs' claim against him is barred by the doctrine of laches. Laches is an equitable defense to claims that have become stale and may be applied at the discretion of the court.  Sullivan v. Buckhorn Ranch P'ship, 119 P.3d 192, 202 (Okla. 2005); Hedges v. Hedges, 66 P.3d 364, 369 (Okla. 2002).  "The party invoking the laches defense must show unreasonable delay coupled with knowledge of the relevant facts resulting in prejudice."  Sullivan, 119 P.3d at 202.  "Laches is not mere delay, but delay that works a disadvantage to another." Newton v. Newton, 956 P.2d 934, 936 (Okla. Civ. App. 1998)

Defendants entered into the relevant agreements with plaintiffs in 2003.  Plaintiffs brought this action in 2004.  Without addressing the question of prejudice, the Court easily concludes that the time within which plaintiffs brought this action was not sufficiently lengthy to offend the dictates

of equity.  See Hedges v. Hedges, 66 P.3d 364, 370 (Okla. 2002) (finding that a ten-year delay was not sufficient to support laches defense when only prejudice that could be demonstrated was need to pay interest on the money owed by defendant).  Assuming, arguendo, that plaintiffs had waited an unreasonable amount of time to file this action, defendant has failed to provide evidence that he was somehow prejudiced by the delay.

### H.

Defendant argues that plaintiffs' claims are precluded by the doctrines of equitable and promissory estoppel.  Equitable estoppel is a legal doctrine which acts to bar a party from alleging or denying certain rights which might otherwise have existed because of the party's voluntary conduct and requires good faith reliance by the party asserting estoppel.  Sullivan, 119 P.3d at 201. Under Oklahoma law, a party asserting equitable estoppel must establish five elements: (1) a false representation or concealment of facts; (2) concealment made with actual or constructive knowledge of the real facts; (3) the party to whom the misrepresentation was made must have been without knowledge or any way of discovering the real facts; (4) the misrepresentation must have been made with the intention that it would be acted upon by the party pleading equitable estoppel; and (5) the party to whom it was made must have relied on, or acted upon, the false representation to his detriment.  Id. at 202.  Defendant makes no attempt to make out a viable defense of equitable estoppel.  The record contains no evidence of a false representation or concealment of facts, an evidentiary finding that is fundamental to a successful claim for equitable estoppel.  Accordingly, the Court finds no genuine issue of material fact for jury consideration as to the availability of the defense of equitable estoppel.

18

Likewise, in order to succeed on his defense of promissory estoppel, defendant must establish the following elements: (1) a clear and unambiguous promise; (2) foreseeability by the promisor that the promisee would rely upon it; (3) reasonable reliance upon the promise to the promisee's detriment; and (4) hardship or unfairness can be avoided only by the promise's enforcement. Barber v. Barber, 77 P.3d 576, 579 (Okla. 2003). Defendant points to no promise made by plaintiff upon which SFT and its guarantors relied to their detriment. Certainly, there is no provision in the Licensing Agreements or the MLA stating that SFT would be relieved of its obligations in the event of severe weather that negatively impacted the company's business prospects.

## I.

Greenstein alleges that plaintiffs failed to mitigate their damages. Oklahoma law requires that parties take only reasonable actions in mitigation of damages. Morris v. Sanchez, 746 P.2d 184, 189 (Okla. 1987). An early pronouncement of this principle by the Oklahoma Supreme Court is: "One who is injured by the acts of another is required to do that which an ordinary prudent person would do under similar circumstances to mitigate or lessen damages. He is, however, not required to unreasonably exert himself or to incur an unreasonable expense in order to do so." Smith-Horton Drilling Co. v. Brooks, 182 P.2d 499, 502 (Okla. 1947). A mitigation effort on the part of an aggrieved party must meet certain standards: (1) it must be in good faith; (2) it must be executed with reasonable skill, prudence, and efficiency; (3) it must be reasonably warranted by and proportioned to the injury and consequences to be averted; and (4) it must be undertaken in a reasonably justified belief that it will avoid or reduce the damage otherwise to be expected from

wrongdoing.  Tulsa Mun. Airport Trust v. Nat'l Gypsum Co., 551 P.2d 304, 311 (Okla. Civ. App. 1976).

There is no factual dispute regarding plaintiffs' course of conduct upon discovery of SFT's breach of the agreements.  Plaintiffs notified SFT of the breach and provided the company with an opportunity to perform in accordance with the terms of the agreements.  Further, DTG representatives took possession of the vehicles leased to SFT, relieving it of the obligation to maintain the cars.  It is not clear what more plaintiffs could have done to mitigate, and the Court finds that no genuine issue of material fact has been raised as to a failure on plaintiffs' part to do so.

### J.

Defendant claims that the doctrine of election of remedies prevents plaintiffs' claims.  At common law, the rule of election of remedies prevented a claimant from pursuing two or more inconsistent remedies and required that the aggrieved individual choose one of the remedies.  Howell v. James, 818 P.2d 444, 446 (Okla. 1991).  The adoption of Rule 8(a) of the Federal Rules of Civil Procedure severely undercut the vitality of the doctrine, permitting the pleading of alternative forms of relief.  In 1984, the Oklahoma legislature adopted the approach of the federal rules, enacting a new pleading statute, which states, in pertinent part, "Relief in the alternative or of several different types may be demanded."  Okla. Stat. tit. 12, § 2008(A)(2).  In Rogers v. Meiser, 68 P.3d 967, 970 (Okla. 2003), the Oklahoma Supreme Court explained the significance of the statutory alteration to the common law doctrine of election of remedies: "Today, while inconsistent judgments or double recovery are *not* permissible, inconsistent theories and remedies *may* be asserted at the pleading stage *and*, in fact, relied on throughout trial."  Id. at 970 n.5 (emphasis in original).

Plaintiffs state they have elected to pursue only their monetary remedies against defendant, making the application of the doctrine of election of remedies inappropriate in this case. Even if plaintiffs sought multiple forms of relief, the Court notes that the law, as outlined above, would not foreclose plaintiffs' pursuit of various forms of relief.

### IV.

Having reviewed the entire record, the Court finds that defendant has presented no evidence demonstrating a genuine issue of material fact as to either the claims advanced by plaintiffs against Greenstein or the availability of the affirmative defenses advanced by defendant. The Court is cognizant of defendant Greenstein's pro se status and has, therefore, made a special effort to consider all of the defenses in defendants' original answer to plaintiff's complaint. Upon consideration of those defenses in light of the summary judgment record, the Court determines that no genuine issue of material fact exists as to any of defendant's defenses. See Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991). ( "Despite the liberal construction afforded pro se pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."). The Court further observes that while defendant Greenstein's response affidavit and surreply insist that summary judgment is inappropriate at this stage, he provides no evidence with which to defeat plaintiff's motion. As the Tenth Circuit has explained,

> [W]hen a movant claims that there is not genuine issue for trial because a material fact is undisputed, the nonmovant must do more than refer to allegations of counsel contained in a brief to withstand summary judgment. Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein. In the absence of such specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.

Thomas v. Wichita Coca-Cola  Bottling Co., 968 F.2d 1022, 1024-25 (10th Cir. 1992).  Defendant has not provided any evidence that would raise a factual question relating to SFT's non-entitlement to the various affirmative defenses addressed herein, at least insofar as Greenstein has plead those defenses on his own behalf.  Moreover, defendant has pointed to no genuine issue of material of fact relating to his obligations under the terms of his guaranty agreements. The Court concludes, therefore, that plaintiffs' motion for summary judgment should be granted as to defendant Greenstein.

## VI.

**IT IS THEREFORE ORDERED** that plaintiffs' motion for summary judgment (Dkt. # 43) is hereby **granted** as to their claim for breach of the guaranty agreements between plaintiffs and defendant Greenstein.  Judgment for plaintiffs, and against defendant Greenstein, in the amount of $4,238,249.53 through August 4, 2005, plus interest, attorney's fees, and costs shall be entered.

**IT IS FURTHER ORDERED** that defendant Greenstein's application to enlarge time for discovery and trial (Dkt. # 63) is hereby **denied**.  That motion, submitted well past the deadlines for discovery and dispositive motives, is untimely and lacking in merit.

**IT IS FURTHER ORDERED** that the pretrial set for October 28, 2005 at 1:30 p.m. and jury trial, set for November 14, 2005 at 9:30 a.m., are hereby **stricken**.  Greenstein's application to participate by telephone in pre-trial conference (Dkt. # 62) is hereby **denied as moot**, and plaintiffs' motion to strike jury demand (Dkt. # 47) is hereby **denied as moot**.  The remainder of this case, as to SFT and Danny L. Hardy, is **stayed** pending the resolution of their bankruptcy proceedings. Plaintiffs shall advise the Court no later than **November 4, 2005** whether they wish to either

administratively close this case pending the bankruptcy proceedings or dismiss their claims against SFT and/or Hardy.

**IT IS FURTHER ORDERED** that, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason for delay of judgment against defendant Greenstein.  Plaintiffs are ordered to submit a proposed form of judgment against Greenstein no later than **November 4, 2005.**

**DATED** this 26th day of October, 2005.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT